Bonnie MacNaughton (Bar No. 107402)
Emily Goodell (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone:    (206) 622-3150
Facsimile:    (206) 757-7700
Email:         bonniemacnaughton@dwt.com
               emilygoodell@dwt.com

John D. Freed (Bar No. 261518)
Jean M. Fundakowski (Bar No. 328796)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Floor 23
San Francisco, CA 94111
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:         jakefreed@dwt.com
               jeanfundakowski@dwt.com

Attorneys for Plaintiffs AMAZON.COM, INC.
and AMAZON TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMAZON.COM, INC., a Delaware corporation, and AMAZON TECHNOLOGIES, INC., a Nevada corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>UMER WASIM, *et al.*,<br><br>        Defendants. | Case No. 3:23-cv-05580-TLT<br><br>**PLAINTIFFS AMAZON.COM. INC. & AMAZON TECHNOLOGIES, INC.'S NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS (1) VTLOGODESIGN, INC.; (2) MK AFFILIATES, INC.; (3) ALI ALAM; (4) DYNAMIC DIGITAL SOLUTIONS LLC; (5) MEHWASH MUNIR; (6) ONE STOP COMPUTER SERVICES LLC; (7) MUHAMMAD ZUBAIR KHAN; (8) TECHTURE INC.; (9) MUHAMMAD MUDASSAR ANWAR; (10) TECH DRIVE PVT LLC; (11) ASHHAR RAWOOF; (12) SMART STARTUP SOLUTIONS; (13) MUHAMMAD USMAN KHAN; (14) YASIR AGAR; (15) MUHAMMAD SHIRAZ QURESHI; AND (16) MAVIA NIZAM** |
| | **Hearing Date:**    **December 10, 2024**<br>**Time:**    **2:00 pm**<br>**Location:**    **San Francisco Courtroom 09 19th Floor**<br><br>Complaint filed:    October 30, 2023 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS GIVEN THAT on December 10, 2024, at 2:00 p.m. or as soon thereafter as the matter may be heard, before the Honorable Judge Trina L. Thompson, in Courtroom 9, 19th Floor, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs Amazon.com, Inc. and Amazon Technologies, Inc. (collectively, "Amazon") will move this Court for entry of default judgment against: (1) VTLogodesign, Inc.; (2) MK Affiliates, Inc.; (3) Ali Alam; (4) Dynamic Digital Solutions LLC; (5) Mehwash Munir; (6) One Stop Computer Services LLC; (7) Muhammad Zubair Khan; (8) Techture Inc.; (9) Muhammad Mudassar Anwar; (10) Tech Drive Pvt LLC; (11) Ashhar Rawoof; (12) Smart Startup Solutions, LLC.; (13) Muhammad Usman Khan; (14) Yasir Agar; (15) Muhammad Shiraz Qureshi; and (16) Mavia Nizam ("Defendants").

This Motion is made on the grounds that Defendants are in default, and Amazon meets the requirements for a default judgment under Federal Rule of Civil Procedure 55(b) and the Ninth Circuit's test in *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Amazon seeks transfer of domains, a judgment under the Lanham Act awarding statutory damages for trademark infringement in the amount of $500,000 per infringed mark, and statutory damages for cybersquatting in the amount of $100,000 per infringing domain and the entry of a permanent injunction.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of John Freed, Emily Goodell, Julia Sommerfeld, Courtney Sakre, Matthew Crossman, Mike Mello, Sharon Williams, Robert Bjorkdahl, John Jaeger, Elena Folkerts, Judy Latimore, and all other pleadings and papers on file, and upon such other oral or documentary matters as may be presented to the Court at or before the hearing of this Motion.

| | |
|---|---|
| 1 | DATED: September 13, 2024 |

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: */s/Emily Goodell*
     Bonnie MacNaughton
     John D. Freed
     Emily Goodell
     Jean M. Fundakowski

Attorneys for Plaintiffs AMAZON.COM, INC.
and AMAZON TECHNOLOGIES, INC.

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 1

    A.    Plaintiffs Are Trusted Brands in E-Commerce and Publishing ............................ 1

        1.    Amazon's Trademarks ............................................................ 1

        2.    Amazon's Publishing Businesses ............................................. 4

            a.    Amazon Publishing ............................................. 4

            b.    Kindle Direct Publishing ..................................... 4

        3.    Defendants' Scheme .............................................................. 5

            a.    Defendants' Trademark Infringement and Cybersquatting ........... 7

        4.    Defendants Substantially Harmed Amazon's Customers and Brands ...... 17

III.  ARGUMENT ...................................................................................................... 21

    A.    The Court Has Jurisdiction To Enter Default Judgment ...................................... 21

        1.    Subject Matter Jurisdiction .................................................... 21

        2.    Personal Jurisdiction ............................................................. 22

            a.    Foreign Defendants ............................................. 22

            b.    California Defendants .......................................... 23

            c.    Domestic Non-California Defendants .................... 23

    B.    Plaintiffs Are Entitled to a Default Judgment ..................................................... 25

        1.    First *Eitel* Factor: Plaintiffs Will Be Prejudiced Without a Default Judgment .................................................................................. 25

        2.    Second and Third *Eitel* Factors: Amazon Has Established Defendants' Liability Under the Lanham Act .......................... 25

            a.    Amazon Has Established Defendants' Liability for Trademark Infringement ................................... 25

            b.    Amazon Has Established Defendants' Liability for False Designation of Origin and False Advertising ...... 26

            c.    Amazon Has Established Defendants' Liability for Cybersquatting ................................................. 27

3.    Fourth *Eitel* Factor: Defendants' Conduct Warrants the Damages Amazon Seeks ........................................................................... 29

4.    Fifth *Eitel* Factor: The Facts Are Undisputed ........................................... 33

5.    Sixth *Eitel* Factor: Defendants' Failure To Appear Is Inexcusable .......... 33

6.    Seventh *Eitel* Factor: Policy Favoring Decisions on the Merits Does Not Preclude Default Judgment as Defendants Failed To Appear .......... 34

C.    Amazon Is Entitled To Statutory Damages .......................................................... 34

1.    Defendants Willfully Infringed Plaintiffs' Trademarks ........................... 34

2.    $500,000 Per Mark and $100,000 Per Domain in Statutory Damages Is a Reasonable Award in Relation to Defendants' Conduct and the Need for Deterrence .................................................................................. 36

D.    Amazon Is Entitled to Injunctive Relief .............................................................. 37

1.    Defendants' Fraud Scheme Causes Irreparable Harm to Plaintiffs that Is Ongoing ............................................................................................. 38

2.    Monetary Damages Alone Are Inadequate .............................................. 38

3.    The Balance of Equities Favors a Permanent Injunction ......................... 39

4.    A Permanent Injunction Will Protect the Public from the Ongoing Harm Caused by Defendants' Impersonation Scheme ............................ 39

E.    Amazon Seeks Court Order for Transfer of Infringing Domains ........................ 39

IV.    CONCLUSION ..................................................................................................................... 40

TABLES OF CONTENTS AND AUTHORITIES CITED IN MOTION FOR DEFAULT JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd.*,
  2021 WL 4461601 (N.D. Cal. 2021) ...................................................................... 32

*Amazon.com, Inc. v. Huang Tengwei*,
  2019 WL 4414957 (W.D. Wash. 2019) .................................................................. 31

*Amazon.com, Inc. v. Oron*,
  Case No. 2:19-cv-00523-RSM (W.D. Wash. 2022), ECF No. 120 ...................... 31, 32

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
  457 F.3d 1062 (9th Cir. 2006) .............................................................................. 26

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .............................................................................. 27

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) .............................................................................................. 23

*Coach Servs., Inc. v. YNM, Inc.*,
  2011 WL 1752091 (C.D. Cal. 2011) ..................................................................... 39

*Curtis v. Illumination Arts, Inc.*,
  33 F. Supp. 3d 1200 (W.D. Wash. 2014), *aff'd*, 682 F. App'x 604 (9th Cir. 2017) ............... 33

*CytoSport, Inc. v. Vital Pharms., Inc.*,
  617 F. Supp. 2d 1051 (E.D. Cal. 2009) ................................................................. 39

*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) .............................................................................. 34

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
  528 F.3d 696 (9th Cir. 2008) ................................................................................ 35

*Digby Adler Grp. LLC v. Image Rent a Car, Inc.*,
  79 F. Supp. 3d 1095 (N.D. Cal. 2015) ....................................................... 28, 32, 34

*Dream Games of Ariz. v. PC Onsite*,
  561 F.3d 983 (9th Cir. 2009) ................................................................................ 36

*Dreiling v. Am. Exp. Co.*,
  458 F.3d 942 (9th Cir. 2006) ................................................................................ 21

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .............................................................................................. 37

*Eitel v. McCool*,
  782 F.2d 1470 (9th Cir. 1986) ..................................................................... *passim*

*Elektra Ent. Grp. Inc. v. Crawford*,
 226 F.R.D. 388 (C.D. Cal. 2005) ....................................................................... 33

*Fair Hous. of Marin v. Combs*,
 285 F.3d 899 (9th Cir. 2002) ............................................................................. 21

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
 778 F.3d 1059 (9th Cir. 2015) ........................................................................... 35

*Ford Motor Co. v. Cross*,
 441 F. Supp. 2d 837 (E.D. Mich. 2006) ............................................................ 40

*Freecycle Network, Inc. v. Oey*,
 505 F.3d 898 (9th Cir. 2007) ............................................................................. 27

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
 564 U.S. 915 (2011) ........................................................................................... 23

*Harris v. Emus Recs. Corp.*,
 734 F.2d 1329 (9th Cir. 1984) ........................................................................... 36

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
 466 U.S. 408 (1984) ........................................................................................... 23

*HICA Educ. Loan Corp. v. Warne*,
 2012 WL 1156402 (N.D. Cal. 2012) .................................................................. 34

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
 485 F.3d 450 (9th Cir. 2007) ............................................................................. 22

*In re Tuli*,
 172 F.3d 707 (9th Cir. 1999) ............................................................................. 21

*Intel Corp. v. Terabyte Int'l, Inc.*,
 6 F.3d 614 (9th Cir. 1993) ................................................................................. 30

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
 559 F.3d 985 (9th Cir. 2009) ............................................................................. 39

*Jackson v. Sturkie*,
 255 F. Supp. 2d 1096 (N.D. Cal. 2003) ............................................................. 38

*Kinsley Tech. Co. v. Ya Creations, Inc.*,
 2021 WL 2227394 (C.D. Cal. 2021) ................................................................... 38

*Kloepping v. Fireman's Fund*,
 1996 WL 75314 (N.D. Cal. 1996) ...................................................................... 21

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
 149 F.3d 987 (9th Cir.1998) .............................................................................. 36

*Luxul Tech. Inc. v. Nectarlux, LLC*,
 78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................... 27

*MAI Sys. Corp. v. Peak Comput., Inc.*,
    991 F.2d 511 (9th Cir. 1993) ............................................................. 37

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) ....................................................... 24, 25

*Meadows v. Dominican Republic*,
    817 F.2d 517 (9th Cir. 1987) ............................................................. 33

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .......................................................... 21

*Microsoft Corp. v. Evans*,
    2007 WL 3034661 (E.D. Cal. 2007) .......................................... 30, 31, 32

*Microsoft Corp. v. Nop*,
    549 F. Supp. 2d 1233 (E.D. Cal. 2008) ...................................... 30, 31, 36

*MySpace, Inc. v. Wallace*,
    498 F. Supp. 2d 1293 (C.D. Cal. 2007) ............................................... 38

*Nautilus, Inc. v. Chunchai Yu*,
    2011 WL 13213575 (C.D. Cal. 2011) ................................................ 36

*Nissan Motor Co. v. Nissan Computer Corp.*,
    246 F.3d 675 (9th Cir. 2000) ............................................................. 24

*Nucal Foods, Inc. v. Kaye*,
    2013 WL 1680643 (E.D. Cal. 2013) .............................................. 25, 28

*Pebble Beach Co. v. Caddy*,
    453 F.3d 1151 (9th Cir. 2006) ....................................................... 22, 23

*Peer Int'l Corp. v. Pausa Recs., Inc.*,
    909 F.2d 1332 (9th Cir. 1990) ........................................................... 36

*PepsiCo, Inc. v. Cal. Sec. Cans*,
    238 F. Supp. 2d 1172 (C.D. Cal. 2002) ...................................... 21, 25, 33

*Philip Morris USA, Inc. v. Castworld Prods., Inc.*,
    219 F.R.D. 494 (C.D. Cal. 2003) ............................................... 25, 30, 33

*Philip Morris USA Inc. v. Liu*,
    489 F. Supp. 2d 1119 (C.D. Cal. 2007) ............................................... 36

*Philip Morris USA v. Otamedia Ltd.*,
    331 F. Supp. 2d 228 (S.D.N.Y. 2004) ................................................ 40

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015) ........................................................... 24

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
    692 F.2d 1272 (9th Cir. 1982) ...................................................... 30, 31

TABLES OF CONTENTS AND AUTHORITIES CITED IN MOTION FOR DEFAULT JUDGMENT

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
    793 F.2d 1132 (9th Cir. 1986) ...................................................... 30

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ...................................................... 26

*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ...................................................... 25

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir.1991) .......................................................... 38

*Rolex Watch U.S.A., Inc. v. Watch Empire LLC*,
    2015 WL 9690322 (C.D. Cal. 2015).............................................. 39

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ........................................................ 24

*Shanghai Automation Instrument Co. v. Kuei*,
    194 F. Supp. 2d 995 (N.D. Cal. 2001) .......................................... 33

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971) .......................................................................... 40

*U.S. Wholesale Outlet & Distrib., Inc. v. US Wholesale*,
    2021 WL 2562596 (E.D. Cal. 2021).............................................. 34

*United States v. Bausch & Lomb Optical Co.*,
    321 U.S. 707 (1944) ...................................................................... 40

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
    515 F. Supp. 3d 1061 (N.D. Cal. 2021) ........................................ 38

*Walden v. Fiore*,
    571 U.S. 277 (2014) ...................................................................... 24

*Warner Bros. Home Ent. Inc. v. Jimenez*,
    2013 WL 3397672 (C.D. Cal. 2013).............................................. 38

*Wecosign, Inc. v. IFG Holdings, Inc.*,
    845 F. Supp. 2d 1072 (C.D. Cal. 2012) .................................. 29, 39

*Williams v. Yamaha Motor Co.*,
    851 F.3d 1015 (9th Cir. 2017) ...................................................... 22

*Wimo Labs, LLC v. eBay, Inc.*,
    2017 WL 10439835 (C.D. Cal. 2017)............................................ 36

TABLES OF CONTENTS AND AUTHORITIES CITED IN MOTION FOR DEFAULT JUDGMENT

**Statutes**

15 U.S.C.

§ 1065....................................................................................................... 2, 4
§ 1114..................................................................................................... 26, 27
§ 1116(a)........................................................................................... 37, 38, 40
§ 1117(c)..................................................................................................... 34
§ 1117(d)................................................................................................. 29, 34
§ 1121......................................................................................................... 21
§ 1125.................................................................................................... 26, 40
§ 1125(d)(1)(C)............................................................................................ 40
§ 1125(d)(2)................................................................................................ 40

17 U.S.C.

§ 1125(d)................................................................................................. 7, 34

28 U.S.C.

§ 1331......................................................................................................... 21
§ 1338(a)..................................................................................................... 21

**Rules**

Fed. R. Civ. P.

Rule 4(k)(2)................................................................................................. 22
Rule 55(a)................................................................................................... 21
Rule 55(b)................................................................................................... 21

**Other Authorities**

S. Rept. No. 104-177 (1995)

ANTICOUNTERFEITING CONSUMER PROTECTION ACT OF 1995 ........................... 29

## I.     INTRODUCTION

Defendants run an international scam operation that defrauds aspiring U.S. authors by faking affiliation with Amazon's legitimate publishing operations. To lure victims—independent authors seeking publication-support services—Defendants registered over twenty domains using Amazon's name; impersonated Amazon employees; and misappropriated Amazon's federally registered trademarks on their websites, emails, contracts, and marketing materials. Defendants charged victims for grossly inferior, unnecessary, and often nonexistent services. Believing Defendants were Amazon or Amazon-affiliated sources of legitimate publishing services, some victims lost thousands—and even tens of thousands—of dollars due to Defendants' fraud.

Sixteen Defendants defaulted after failing to appear and defend themselves. Amazon now seeks default judgment against those Defendants on its Lanham Act claims for trademark infringement, false designation of origin, and cybersquatting. Amazon requests statutory damages in the amount of $500,000 per infringed mark and statutory damages for cybersquatting in the amount of $100,000 per infringing domain and the entry of a permanent injunction which prohibits Defendants from continuing to harm Amazon's customers and brands and orders the infringing domains to be transferred to Amazon to prevent further abuse.

## II.     FACTUAL BACKGROUND

### A.     Plaintiffs Are Trusted Brands in E-Commerce and Publishing

Plaintiffs are Amazon.com, Inc. and Amazon Technologies, Inc. (collectively, "Amazon"). Amazon owns and operates the website at Amazon.com. ECF No. 1 (Compl.) ¶ 30. Amazon Technologies, Inc. is a subsidiary of Amazon.com Inc. and the registered owner of the alleged trademarks. Compl. ¶ 5; Declaration of John D. Freed ("Freed Decl.") ¶¶ 2-3, Ex. A.

#### 1.     Amazon's Trademarks

Amazon relies on its name and registered trademarks to distinguish its products and services from those of others. Declaration of Matthew Crossman ("Crossman Decl.") ¶ 7.

**Figure 1** below is a screenshot of Amazon.com, whose domain is owned by Amazon. Compl. ¶ 30; Crossman Decl. ¶ 4, Ex. A. The upper left corner of the website features—and has featured during the entire period relevant to this lawsuit—a trademarked Amazon logo containing

MOTION FOR DEFAULT JUDGMENT

the word "amazon" in white text above an orange arrow in the shape of a smile. *Id*. The color

scheme of Amazon.com is white, Smile Orange (orange), black, and Squid Ink (dark blue). *Id*.,

Crossman Decl. ¶¶ 4-5.

**Fig. 1.**



Amazon uses the white and orange smile mark shown in Figure 1 as well as the 7 marks in

Figure 2 below (collectively, the "Amazon Marks") to conduct business on Amazon.com and in

its publishing businesses, Amazon Publishing ("APub") and Kindle Direct Publishing ("KDP").

Compl. ¶ 37. Each of the Amazon Marks have been used exclusively and continuously by

Amazon and have never been abandoned. ¶ 36. Their registrations are valid, subsisting, in full

force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. *Id*. The fact of their

registration constitutes prima facie evidence of their validity and of Amazon's right to their

exclusive use. *Id*.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MOTION FOR DEFAULT JUDGMENT

**Fig. 2.**

| Number | Trademarks | Registration Nos. | |
|---|---|---|---|
| 1 | AMAZON | 2,078,496<br>2,559,936<br>2,857,590<br>2,832,943<br>2,738,837<br>2,738,838<br>2,657,226<br>3,868,195<br>4,171,964<br>4,533,716 | 4,608,470<br>4,656,529<br>4,907,371<br>5,102,687<br>5,281,455<br>5,906,636<br>6,228,267<br>6,687,103<br>6,776,595<br>7,055,661 |
| 2 |  | 4,171,965<br>5,038,752<br>5,508,999<br>5,775,740<br>6,136,716 | 6,200,815<br>6,019,093<br>6,687,104<br>6,776,596<br>7,055,662 |
| 3 |  | 6,666,404 | |
| 4 | AMAZON.COM | 3,411,872<br>2,633,281<br>2,837,138<br>2,167,345<br>2,903,561 | |
| 5 |  | 2,951,941<br>4,841,614<br>5,775,763<br>6,097,171 | 6,178,564<br>6,810,456<br>7,055,660<br>7,108,071 |
| 6 | KINDLE | 3,694,267<br>4,289,293<br>4,380,471<br>4,932,736<br>5,054,865<br>5,146,885 | |
| 7 |  | 6,834,173 | |
| 8 |  | 3,709,331 | |

MOTION FOR DEFAULT JUDGMENT

Case No. 4:23-cv-05580-TLT

### 2.    Amazon's Publishing Businesses

APub and KDP are popular services owned and operated by Amazon which have helped millions of authors publish or self-publish their creative works. ¶ 2.

### a.    Amazon Publishing

APub was founded in 2009. ¶ 31. APub is Amazon's in-house trade publisher of fiction, nonfiction, young adult, and children's books and publishes emerging, bestselling, and critically-acclaimed authors in digital, print, and audio formats. *Id.* APub has helped over a hundred authors (and counting) reach more than one million readers and over a thousand authors earn more than $50,000 from their writing. *Id.* APub authors have received more than 450 award nominations. *Id.* APub's editors acquire titles through 17 imprints in the U.S., 5 in the UK, and 5 in Germany, a process which involves negotiating terms with the author which grants APub the right to publish, market, and distribute the author's book in exchange for a flat fee payment or royalties from the book's sales. *Id.*

APub's editorial, sales, marketing, publicity, design, production, user research, product innovation, author services, and software engineering teams innovate to help authors share their stories with a global audience and deliver a high-impact, diverse selection of titles for readers and listeners to enjoy. *Id.* APub advertises and operates the website at amazonpublishing.amazon.com. *Id.* ¶¶ 31-32; Declaration of Julia Sommerfeld ("Sommerfeld Decl.") ¶ 8.

### b.    Kindle Direct Publishing

KDP allows authors to self-publish books in print and digital formats for free and reach millions of readers in over a dozen Amazon marketplaces and 175 countries. Compl. ¶ 33. KDP has helped millions of authors reach new readers and pursue careers in self-publishing. *Id.* KDP self-published authors have won numerous awards, including the Romance Writers of America RITA Award, the highest award of distinction in romance fiction. *Id.* More than 269,000 people follow Amazon's KDP Facebook page and more than 78,800 people follow Amazon's KDP X (formerly known as Twitter) social media feed. *Id.*

KDP authors control the rights to their titles and can make changes to their books at any time. ¶ 34. Authors can set up an eBook for publication within minutes, and within 72 hours the

eBook appears for sale on the Amazon Kindle Store. *Id.* When publishing, authors select a royalty plan, which determines what percentage of amounts earned from sales are paid to the author. KDP offers numerous free services to authors, including a program called KDP Select that allows authors to reach additional readers through the Kindle Unlimited subscription service, enables authors to take advantage of Amazon and Kindle promotions on their titles, and gives authors access to promotional tools such as free giveaway days and time-based price promotions. *Id.* The KDP Select Global Fund has provided more than $2.8 billion dollars in royalties to participants in KDP Select for their participation in Kindle Unlimited. *Id.* An author listing an eBook can gift a redemption code for a free copy and can create a free Author Page. *Id.* Additional related services that KDP offers for free include providing an International Standard Book Number, which is required to publish a paperback or hardcover book, free tools for creating book covers, templates, front, body and back matter elements and Kindle Create software, a free interior formatting tool. *Id.* KDP authors can enroll for free in an Expanded Distribution program, which makes paperbacks that are available on Amazon.com also available to distributors, allowing booksellers and libraries to order them. *Id.* Amazon also offers advertising for KDP books on a cost-per-click basis. KDP advertises and operates the website at kdp.amazon.com. *Id.* ¶ 35; Declaration Courtney Sakre ("Sakre Decl.") ¶ 12 & Ex. A.

### 3.    Defendants' Scheme

Defendants are individuals and entities based in the United States and Pakistan who operated a scam that preys on authors and induces them to purchase fraudulent services. Compl. ¶ 3. Defendants recruited victims through 26[1] websites ("Websites") that made extensive use of Amazon's trademarks.[2] Not only did Defendants' Websites confuse authors as to the Websites' affiliation, Defendants misrepresented their affiliation with Amazon, KDP, and APub, including

---

[1] The Complaint alleges the scam included 26 Websites, but Websites 1-5 are operated by Defendants who have not defaulted—Umer Wasim and Teknobyl Digital LLC—and thus only 21 of the 26 websites are the subject of Amazon's default judgment motion.

[2] Only 3 of the 21 Websites tied to the defaulting Defendants are active as of the September 10, 2024. Freed Decl. ¶ 4. Amazon brought UDRP enforcement actions against the domain names for Websites 1-5, 7, 11, 12-15, 18, 20-21, 24, and 26 when those Websites were still active. *Id.* ¶ 5; Compl. ¶ 151.

by sending authors documents containing forged signatures of Amazon executives. Compl. ¶¶ 3, 63, fig. 13; Sommerfeld Decl. ¶¶ 10-11 (image of fake certificate sent to a victim purportedly signed by APub Head of Publishing declaring that Amazon certifies that Amazon Digital Publishing (Website 6) is "the best marketing agency for Kindle books and author reputation online."). Aspiring authors, believing they are working with Amazon, pay Defendants substantial sums of money, often thousands of dollars, for grossly inadequate or non-existent services. Compl. ¶ 3. Although some defrauded authors manage to obtain refunds, many do not. *Id.* Defendants' egregious and purposeful conduct has caused significant harm to the author and publisher community, as well as to Amazon's reputation and the goodwill it has developed with this community. *Id.*

Defendants use the Amazon Marks in their domain names and on their Websites to divert victims from Amazon's genuine websites to Defendants' Websites that purport to offer services to help authors create, edit, and publish their works through APub or KDP. ¶ 37. The Websites also prominently display references to Amazon including: "Looking to Publish Your Book on Amazon?"; "Amazon KDP Focused Book Marketing Services"; and "Customizable Publishing Packages by Amazon Professional Publishers" to further the ruse of affiliation with Amazon. *Id.* The Websites use chat boxes that pop up on their sites and advertise phone numbers to call where scammers make false representations about their affiliation with Amazon and provide documentation with false and misleading representations of affiliation with Amazon that deceive victims into believing Defendants are affiliated with Amazon. *Id.*

Amazon obtained registrant information for some of the 26 Websites by filing multiple Uniform Domain-Name Dispute-Resolution Policy ("UDRP") actions; it was also able to unmask the identities of confidential registrants through third-party subpoenas to affiliated registrars NameCheap and GoDaddy. Compl. ¶ 38; Freed Decl. ¶¶ 5-8 & Exs. B-C. Many of the Websites use overlapping service providers, IP addresses, website graphics and design, and language, and advertise overlapping physical addresses. Compl. ¶ 38. Defendants' billing entities use overlapping Website and entity names. *Id.* ¶ 39.

MOTION FOR DEFAULT JUDGMENT

### a.    Defendants' Trademark Infringement and Cybersquatting

Amazon reprises the uncontested allegations against each of the 16 defaulting Defendants, including which of the 21 Websites they are affiliated with, how many unique Amazon Marks those Websites infringed, and whether the Defendant was the registrant of any of Website domains and thus subject to cybersquatting damages under 17 U.S.C. § 1125(d).

For the Court's convenience, Amazon has prepared tables summarizing which of the 21 Websites operated by the defaulting Defendants infringe the Amazon Marks; which Defendants are connected to which Website, with accompanying citations to the allegations in the Complaint; and Amazon's proposed statutory damages against each Defendant. Freed Decl. ¶ 11 & Exs. D-F.

### (1)    Umer Wasim and Teknobyl Digital LLC

Defendants Umer Wasim and Teknobyl Digital LLC ("Teknobyl") are not in default and are negotiating a separate settlement with Amazon. Declaration of Emily Goodell ("Goodell Decl.") Goodell Decl. ¶¶ 4-6. As a result, Amazon is not seeking entry of default judgment against Wasim and Teknobyl. *Id.*

### (2)    Muhammad Usman Khan

Muhammad Usman Khan ("MU Khan") is an individual believed to be residing in Pakistan. ECF No. 61-1 ¶ 13. With the Court's authorization, Amazon served MU Khan by e-mail on March 8, 2024. ECF Nos. 57, 61-1  ¶¶ 5-24. The Clerk of Court entered default against Usman Khan on May 20, 2024. ECF No. 62.

As alleged in the Complaint, MU Khan owned, operated, or was otherwise affiliated with 4 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶ 61); Website 7 (¶ 62); Website 22 (¶ 63); and Website 26 (¶ 121). Websites 6, 7, 22, and 26 infringed 5 unique Amazon Marks: Marks 1, 2, 3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 5 Amazon Marks, for total statutory damages for trademark infringement of $2,500,000.

### (3)    VTLogoDesign, Inc.

VTLogoDesign, Inc ("VTL") is a Florida corporation which was dissolved on September 22, 2022. ECF No. 46-1, Ex. A. VTL was served by substitute service on the Florida Secretary of State as permitted under Florida law on December 19, 2023. ECF No. 46-1 ¶¶ 50-11, Ex. C. The Clerk of Court entered default against VTL on February 14, 2014. ECF No. 52.

As alleged in the Complaint, VTL owned, operated, or was otherwise affiliated with 7 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶ 61); Website 7 (¶ 62); Website 8 (¶ 61); Website 9 (*Compare* ¶ 68, fig. 15 *with* ¶ 70, fig. 16 *and* ¶ 72, fig. 17); Website 10 (¶ 72); Website 22 (Compl. ¶ 108); and Website 26 (¶ 121). Websites 6, 7, 8-10, 22, and 26 infringed 5 unique Amazon Marks: Marks 1-3, 6, and 7. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 5 Amazon Marks against VTL, for total statutory damages for trademark infringement of $2,500,000.

### (4)    MK Affiliates, Inc.

MK Affiliates, Inc. ("MKA") is a Florida corporation which was dissolved on September 22, 2023. ECF No. 46-1 ¶ 12, Ex. D. MKA was served by substitute service on the Florida Secretary of State on December 19, 2024, as permitted under Florida law. *Id.* ¶¶ 12-14, Ex. F. The Clerk of Court entered default against MKA on February 14, 2024. ECF No. 52.

As alleged in the Complaint, MKA owned, operated, or was otherwise affiliated with 4 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶ 62); Website 7 (¶ 65); Website 22 (¶ 108); and Website 26 (¶ 121). Websites 6, 7, 22, and 26 infringed 5 unique Amazon Marks: Marks 1-3, 6, and 7. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 5 Amazon Marks against MKA, for total statutory damages for trademark infringement of $2,500,000.

### (5)    Ali Alam

Ali Alam is an individual residing in Virginia. ECF No. 26 at 1. Alam was personally served November 15, 2023. *Id.* Mr. Alam contacted counsel for Amazon in November 2023 on

behalf of himself and Defendants Mehwash Munir, Dynamic Digital Solutions, and One Stop Computer Services, acknowledged he had been served with the Complaint, but subsequently ceased all contact and refused to provide further information. Goodell Decl. ¶¶ 7-8 & Ex. A. The Clerk of Court entered default against Alam on February 14, 2024. ECF No. 52.

As alleged in the Complaint, Alam owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶ 62); Website 7 (¶ 65); Website 20 (¶ 103); Website 22 (¶ 108); and Website 26 (¶ 121). Websites 6, 7, 20, 22, and 26 infringed 5 unique Amazon Marks: Marks 1-3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 5 Amazon Marks against Alam, for total statutory damages for trademark infringement of $2,500,000.

Alam was the domain name registrant for Website 20 (Compl. ¶ 103), and Amazon has learned through subsequent discovery from registrar GoDaddy that Alam was also the domain name registrant (with Defendant Nizam) for Websites 19 and 23. Freed Decl., Ex. B at 1-2. The domain names for Websites 19, 20, and 23 are confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that these domains were registered in bad faith and used by Alam with an intent to profit.[3] Amazon seeks an additional $100,000 per domain in cybersquatting damages, for a total of $300,000 against Alam.

Accordingly, Amazon seeks a total of $2,800,000 in damages against Alam.

### (6)     Dynamic Digital Solutions LLC

Dynamic Digital Solutions LLC ("DDS") is a limited liability company incorporated in Virginia. ECF No. 46-1, Ex. H. DDS was served by personal service on its registered agent, Defendant Alam, on November 15, 2023. ECF No. 26 at 2. The Clerk of Court entered default against DDS on February 14, 2024. ECF No. 52.

As alleged in the Complaint, DDS owned, operated, or was otherwise affiliated with 3 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they

---

[3] Amzdigitalpro.com (Website 19) (Compl. ¶¶ 100-02); amazonpublisherpro.com (Website 20) (¶¶ 103-04); and amazonkdpublishing.com (Website 23) (¶¶ 109-12).

MOTION FOR DEFAULT JUDGMENT

were doing business with Amazon, APub, or KDP: Website 11 (Compl. ¶ 75); Website 13 (¶ 77); and Website 26 (¶ 121). Websites 11, 13, and 26 infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against DDS, for total statutory damages for trademark infringement of $2,000,000.

### (7) Mehwash Munir

Mehwash Munir is an individual residing in Virginia. ECF No. 31. Munir was personally served on November 18, 2023. *Id*. The Clerk of Court entered default against Munir on February 14, 2024. ECF No. 52.

As alleged in the Complaint, Munir owned, operated, or was otherwise affiliated with 4 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶¶ 14, 61); Website 7 (¶ 66); Website 22 (¶ 63); and Website 26 (¶ 121). Websites 6, 7, 22, and 26 infringed 5 unique Amazon Marks: Marks 1-3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 5 Amazon Marks against Munir, for total statutory damages for trademark infringement of $2,500,000.

### (8) One Stop Computer Services LLC

One Stop Computer Services LLC ("OSCS") is a limited liability company incorporated in Virginia which canceled its registration on November 9, 2023.  ECF No. 46-1, Ex. J. OSCS was served by personal service on its registered agent, Defendant Munir, on November 15, 2023. ECF No. 26 at 3. After it failed to appear, the Clerk of Court entered default against OSCS on February 14, 2024. ECF No. 52.

As alleged in the Complaint, OSCS owned, operated, or was otherwise affiliated with 4 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶¶ 61); Website 7 (¶ 66); Website 22 (¶ 63); and Website 26 (¶ 121). Websites 6, 7, 22, and 26 infringed 5 unique Amazon Marks: Marks 1-3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory

damages for the willful infringement of each of the 5 Amazon Marks against OSCS, for total statutory damages for trademark infringement of $2,500,000.

### (9)    Muhammad Zubair Khan

Muhammad Zubair Khan ("MZ Khan") is an individual residing in California. MZ Khan was personally served on November 14, 2023. ECF No. 25 at 1. An attorney representing MZ Khan and Techture Inc. contacted counsel for Amazon in July 2024, admitted he was aware that his client had been defaulted, and subsequently failed to provide further information to Amazon. *Id.* ¶¶ 17-19. Neither MZ Khan nor his attorney have appeared in this case or served a responsive pleading. ¶ 19. The Clerk of Court entered default against MZ Khan on February 14, 2024. ECF No. 52.

As alleged in the Complaint, MZ Khan owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 11 (Compl. ¶ 75); Website 12 (¶ 81); Website 13 (¶ 77); Website 16 (¶ 89) and Website 17 (¶ 92). These 5 Websites infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against MZ Khan, for total statutory damages for trademark infringement of $2,000,000.

MZ Khan was the domain name registrant for Websites 16 (Compl. ¶ 89) and 17 (¶ 92). The domain names for Websites 16 and 17 are confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that these domains were registered in bad faith and used by MZ Khan with an intent to profit.[4] Amazon seeks an additional $100,000 per domain in cybersquatting damages, for a total of $200,000 against MZ Khan.

Accordingly, Amazon seeks a total of $2,200,000 in damages against MZ Khan.

### (10)    Techture Inc.

Techture Inc. ("TI") is a corporation incorporated in California by MZ Khan, its CEO. ECF No. 46-1, ¶ 28, Ex. M. TI was served by personal service on MZ Khan, its registered agent,

---

[4] Amazonpublishers.ca (Website 16) (Compl. ¶¶ 89-91); amazonbookhub.com (Website 17) (¶¶ 92-94).

MOTION FOR DEFAULT JUDGMENT

on November 14, 2022. ECF No. 25 at 2. The Clerk of Court entered default against TI on February 14, 2024. ECF No. 52.

As alleged in the Complaint, TI owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 11 (Compl. ¶ 76); Website 12 (¶ 81); Website 13 (¶ 77); Website 16 (¶ 89) and Website 17 (¶ 92). These 5 Websites infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against TI, for total statutory damages for trademark infringement of $2,000,000.

### (11)    Muhammad Mudassar Anwar

Muhammad Mudassar Anwar is an individual residing in New York. ECF No. 27 at 1. Anwar was personally served on November 27, 2023. *Id*. The Clerk of Court entered default against Anwar on February 14, 2024. ECF No. 52.

As alleged in the Complaint, Anwar owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive viewers into believing they were doing business with Amazon, APub, or KDP: Website 8 (Compl. ¶¶ 71, 113); Website 9 (¶¶ 71, 113); Website 10 (¶ 71, 113); Website 24 (¶ 113) and Website 25 (¶ 113, 115). These 5 Websites infringed 3 unique Amazon Marks: Marks 1, 2, and 3. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 3 Amazon Marks against Anwar, for total statutory damages for trademark infringement of $1,500,000.

### (12)    Tech Drive PVT LLC

Tech Drive PVT LLC ("TD") is a limited liability company incorporated in New York. ECF No. 46-1 at ¶ 33, Ex. O. TD was served by personal service on Anwar, its registered agent, on November 27, 2024. ECF No. 27 at 2. The Clerk of Court entered default against TD on February 14, 2024. ECF No. 52.

As alleged in the Complaint, TD owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they

MOTION FOR DEFAULT JUDGMENT

were doing business with Amazon, APub, or KDP: Website 8 (*Compare* Compl. ¶ 68, fig. 15 with ¶ 70, fig. 16 *and* ¶ 72, fig. 17); Website 9 (*id.*); Website 10 (¶¶ 71, 113); Freed Decl. ¶ 8 & Ex. C at 2 (Namecheap records showing Website 10 registered by Tech Drive); Website 24 (Compl. ¶ 113) and Website 25 (¶ 113, 115; Freed Decl. ¶ 8, Ex. C at 1 (Namecheap records showing Website 25 registered by Tech Drive)). These 5 Websites infringed 3 unique Amazon Marks: Marks 1, 2, and 3. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 3 Amazon Marks against Tech Drive, for total statutory damages for trademark infringement of $1,500,000.

TD was the domain name registrant for Website 24 (Compl. ¶ 113), and Amazon has learned through subsequent discovery from registrar NameCheap that TD was also the domain name registrant for Websites 10 and 25. Freed Decl. ¶ 8 & Ex. C at 2. The domain names for Websites 10, 24, and 25 are confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that these domains were registered in bad faith and used by TD with an intent to profit.[5] Amazon seeks an additional $100,000 per domain in cybersquatting damages, for a total of $300,000 against TD.

Accordingly, Amazon seeks a total of $1,800,000 in damages against TD.

### (13)    Ashhar Rawoof

Ashhar Rawoof is an individual residing in Texas. Rawoof was personally served on November 27, 2023. ECF No. 27 at 3. The Clerk of Court entered default against Rawoof on February 14, 2024. ECF No. 52.

As alleged in the Complaint, Rawoof owned, operated, or was otherwise affiliated with 3 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 6 (Compl. ¶¶ 65-66); Website 7 (¶ 65); and Website 22 (¶¶ 63, 65-66). These 3 Websites infringed 5 unique Amazon Marks: Marks 1-3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the

---

[5] Amazonpublishingsol.com (Website 10) (Compl. ¶¶ 71-72); amazonpublishingpartner.com (Website 24) (¶¶ 113-15); and amazonprofessionalpublishers.com (Website 25) (¶¶ 116-18).

willful infringement of each of the 3 Amazon Marks against Rawoof, for total statutory damages for trademark infringement of $2,500,000.

Rawoof was the domain name registrant for Website 7 (Compl. ¶ 65). The domain name for Website 7 is confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that the domain was registered in bad faith and used by Rawoof with an intent to profit.[6] Amazon seeks an additional $100,000 in cybersquatting damages against Rawoof.

Accordingly, Amazon seeks a total of $2,600,000 in damages against Rawoof.

### (14)    Smart Startup Solutions, LLC

Smart Startup Solutions, LLC ("SSS") is a limited liability company incorporated in Illinois. ECF No. 46-1 at ¶ 39, Ex. P. SSS was served by personal service on its registered agent on November 20, 2023. ECF No. 29. The Clerk of Court entered default against SSS on February 14, 2024. ECF No. 52.

As alleged in the Complaint, SSS owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 11 (Compl. ¶ 77); Website 12 (¶82, fig. 22); Website 13 (¶ 83); Website 14 (¶ 77) and Website 15 (¶ 87). These 5 websites infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 1. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against SSS, for total statutory damages for trademark infringement of $2,000,000.

Accordingly, Amazon seeks a total of $2,000,000 in damages against SSS.

### (15)    Yasir Agar

Yasir Agar is an individual residing in Karachi, Pakistan. ECF No. 61-1 ¶¶ 27-29. With the Court's authorization, Amazon served Agar by e-mail on March 8, 2024. ECF No. 57; 61-1 ¶¶ 25-41. The Clerk of Court entered default against Agar on May 20, 2024. ECF No. 62.

---

[6] Amazonkindledirectpublishing.com (Website 7) (Compl. ¶¶ 64-66).

As alleged in the Complaint, Agar owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 11 (Compl. ¶ 81); Website 12 (¶ 79); Website 13 (¶ 82); Website 14 (¶ 85); and Website 15 (¶ 87). These 5 Websites infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against Agar, for total statutory damages for trademark infringement of $2,000,000.

Agar was the domain name registrant for Websites 12-15 (Compl. ¶¶ 79, 82, 85, 87). The domain names for Websites 12-15 are confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that the domains were registered in bad faith and used by Agar with an intent to profit.[7] Amazon seeks an additional $100,000 per domain in cybersquatting damages, for a total of $400,000 against Agar.

Accordingly, Amazon seeks a total of $2,400,000 in damages against Agar.

### (16)    Mavia Nizam

Mavia Nizam is an individual residing in Karachi, Pakistan. ECF No. 61-1 ¶¶ 61. With the Court's authorization, Amazon served Nizam by e-mail on March 8, 2024. ECF No. 57; 61-1 ¶¶ 60-83. The Clerk of Court entered default against Nizam on May 20, 2024. ECF No. 62.

As alleged in the Complaint, Nizam owned, operated, or was otherwise affiliated with 5 Websites that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 18 (Compl. ¶ 95); Website 19 (¶¶ 97-98); Website 20 (¶¶ 20, 103); Website 21 (¶¶ 95, 105); and Website 23 (¶ 105). These 5 Websites infringed 4 unique Amazon Marks: Marks 1-3 and 6. Freed Decl., Ex. E at 1-2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against Nizam, for total statutory damages for trademark infringement of $2,000,000.

---

[7] Amazonprofinc.com (Website 12) (Compl. ¶¶ 79-81); amazonkindlebookpublishing.com (Website 13) (¶¶ 82-84); amazonkindleproinc.com (Website 14) (¶¶ 85-86); and amazonkdpublishers.com (Website 15) (¶¶ 87-88).

MOTION FOR DEFAULT JUDGMENT

Nizam was the domain name registrant for Websites 18, 20-21, and 23 (Compl. ¶¶ 95, 105), and Amazon has learned through subsequent discovery from registrar GoDaddy that Nizam (with Alam) was also the domain name registrant for Website 19. Freed Decl. ¶ 7 & Ex. B at 1. The domain names for Websites 18-21 and 23 are confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised paid publishing services, showing that these domains were registered in bad faith and used by Nizam with an intent to profit.[8] Amazon seeks an additional $100,000 per domain in cybersquatting damages, for a total of $500,000 against Nizam.

Accordingly, Amazon seeks a total of $2,500,000 in damages against Nizam.

### (17)    Muhammad Shiraz Qureshi

Muhammad Shiraz Qureshi is an individual residing in Karachi, Pakistan. ECF No. 61-1 ¶¶ 43-45. With the Court's authorization, Amazon served Qureshi by e-mail on March 8, 2024. ECF No. 57; 61-1 ¶¶ 42-59. Mr. Qureshi contacted counsel for Amazon personally in November 2023 and through an attorney in May and June 2024, but declined to provide requested information about the scheme; he and his attorney were aware of the lawsuit and that he had been defaulted, but he has never served a responsive pleading or had his attorney make an appearance. Goodell Decl. ¶¶ 9-13 & Ex. B. The Clerk of Court entered default against Qureshi on May 20, 2024. ECF No. 62.

As alleged in the Complaint, Qureshi owned, operated, or was otherwise affiliated with 1 Website that intentionally and willfully used Amazon Marks to deceive users into believing they were doing business with Amazon, APub, or KDP: Website 26 (Compl. ¶ 81). This website infringed 4 unique Amazon Marks: Marks 1, 3, 6, and 8. Freed Decl., Ex. E at 2. Amazon seeks $500,000 in statutory damages for the willful infringement of each of the 4 Amazon Marks against Qureshi, for total statutory damages for trademark infringement of $2,000,000.

Qureshi was the domain name registrant for Website 26 (Compl. ¶ 119). The domain name for Website 26 is confusingly similar to Amazon Mark 3 ("AMAZON.COM") and advertised

---

[8] Amazondigitalpro.com (Website 18) (Compl. ¶¶ 95-98); amzdigitalpro.com (Website 19) (¶¶ 100-02); amazonpublisherpro.com (Website 20) (¶¶ 103-04); amazonpublishingzone.com (Website 21) (¶¶ 105-06); and amazonkdppublication.com (Website 23) (¶¶ 109-12).

paid publishing services, showing that the domain was registered in bad faith and used by Qureshi with an intent to profit.[9] Amazon seeks an additional $100,000 in cybersquatting damages against Qureshi.

Accordingly, Amazon seeks a total of $2,100,000 in damages against Qureshi.

### 4.    Defendants Substantially Harmed Amazon's Customers and Brands

Defendants abused the trust in Amazon's brand and reputation to prey on Amazon's customers. The damage done to Amazon's customers is impossible to calculate because the total number of victims, and the amounts of their injuries, are unknown.

Amazon's customers were substantially harmed, including:

**Sharon Williams**

Sharon Williams of Indiana, an 82-year-old woman, was defrauded by Website 26 operators, Defendants OSCS, DDS, and MKA, and paid more than $35,000 to publish and promote her book under the belief that she was working with Amazon. Defendants substantially underperformed or did not provide the promised services at all. Declaration of Sharon Williams ("Williams Decl.") ¶¶ 9, 17, 21. She obtained a partial refund only after agreeing to withdraw a credit card dispute she had filed against their company, "AMZ Kindle Publishing" to recover fraudulent charges. *Id.* ¶¶ 26, 29. Defendants overcharged to promote her book to such an extent that she worried she would have to leave the debt behind for her family. *Id.* ¶ 21 & Ex. D.

**Robert Bjorkdahl**

Robert Bjorkdahl of Maine paid the operators of amazonprofinc.com (Website 12)—including Defendant TI, which received Bjorkdahl's payment—$2,250 for publishing and marketing services, under the belief that he was working with Amazon. Declaration of Robert Bjorkdahl ("Bjorkdahl Decl.") ¶¶ 7, 12. Defendants were slow to perform any work, "did not know what they were

---

[9] Amzkindlepublishing.com (Website 26) (¶¶ 119-20).

MOTION FOR DEFAULT JUDGMENT

doing," ultimately delivered a promotional website with extensive typographical errors and failed to provide a requested refund while continuing to upsell him on additional services. ¶¶ 14-18.

**John Jaeger**

John Jaeger of California paid $9,000, under the belief that he was working with Amazon, to the operators of amazonproinc.com (Website 11), who promised to make his book "one of the best sellers" if he was "willing to join hands with Amazon." Declaration of John Jaeger ("Jaeger Decl.") ¶¶ 6-8. The promotional website they designed for Jaeger was so amateur in nature that he told them "it was a joke." ¶ 19. Two weeks after Jaeger obtained a chargeback for the $9,000 from his credit card companies, he was approached by agents of Amazon Kindle Book Publishing (Website 13), who proposed that he invest $8,200 for additional publishing services. ¶ 24 & Ex. E. Defendant Agar was the registrant for Websites 11 and 13, *see* Compl. ¶¶ 79, 82, 85, 87, indicating that he and others sought to revictimize Jaeger a second time and the aggressive tactics at play in this scheme.

**Elena Folkerts**

Elena Folkerts of Florida paid $7,023, under the belief that she was working with Amazon, to the operators of amazondigitalpublishing.com (Website 6), including Defendants VTL and MKA for self-publishing and marketing services. Declaration of Elena Folkerts ("Folkerts Decl.") ¶¶ 3, 5, 19. The scammers performed "shoddy and unacceptable work," including preparing a press release with quotes about other works and introducing new typographical and formatting errors in her existing book and publishing them without Folkerts' consent on Amazon.com and Barnes & Noble's self-publishing service. ¶ 16. Folkerts was only able to obtain a $500 chargeback after filing a complaint with her credit card provider; she sued MKA in Florida small claims court (likely incurring additional costs to do so) but was unable to successfully locate and serve its registered agent, Defendant MU Khan. ¶¶ 19-20.

MOTION FOR DEFAULT JUDGMENT

**Judy Latimore**

Judy Latimore of Oklahoma paid $1,599, under the belief she was working with Amazon, to the operators of amazondigitalpublishing.com (Website 6) for an e-book publishing package, including editing, proofreading, formatting, typesetting, and publication. Declaration of Judy Latimore ("Latimore Decl." ) ¶¶ 5-6. When Latimore visited Website 6, she believed she "was on Amazon's official site" because of the Amazon logo with an arrow and the familiar orange and black color scheme. ¶ 7 (showing Amazon Mark 3). She used a chat box on Website 6 and had a phone call with a woman who assured her that Amazon Digital Publishing "was a part of Amazon" and then sent her a proposed contract using the same Amazon trademark. ¶¶ 10-11 & Exs. A, B. After paying $1,599, Latimore discovered additional fraudulent charges on her credit card statement; when she contacted the phone number for Amazon Digital Publishing on her statement, an individual answered on behalf of Defendant VTLogoDesigns, Inc., and abruptly disconnected the call. ¶¶ 14-15 & Exs. C, D. Amazon Digital Publishing never provided any publishing services to Latimore, but did refund her payment after she threatened to file a dispute with her bank. Ex. D.

Williams, Folkerts, Jaeger, Bjorkdahl, Latimore, and other victims of this scheme all wanted to work with Amazon and only agreed to work with the individuals who scammed them because Defendants explicitly lied and made representations that they were part of Amazon or had some affiliation with Amazon. Most victims' first point of contact with the scammers was visiting one of the 26 Websites bearing Amazon Marks at issue in this case or receiving emails from domain names that intentionally mimicked the Amazon, KDP, or APub domains. Williams Decl. ¶¶ 5-6; Folkerts Decl. ¶¶ 5-6; Jaeger Decl. ¶¶ 6-9; Bjorkdahl Decl. ¶¶ 6-9; Latimore Decl. ¶¶ 5-7; Compl. ¶¶ 61-63, 75-55, 81 (recounting victims who visited Websites 6, 11, and 12 and did business with scammers based on the false believe their business was part of Amazon).

Defendants then further used the Amazon Marks to reinforce the false impressions created by the Websites and domain names. Defendants sent Folkerts a fake "Letter of Acceptance"

MOTION FOR DEFAULT JUDGMENT

bearing Amazon's Kindle smile trademark (Amazon Mark 6) and the fake signature of Mikyla

Bruder, who at the time was the Amazon Head of APub. Folkerts Decl. ¶ 12 & Ex. G; APub Decl.

¶ 11. Jaeger received emails from purported Amazon executives with email signatures including

the Amazon color smile trademark (Amazon Mark 3) and titles like "Travis Moore, Amazon

KDP." Jaeger Decl., Exs. A, B. Williams received similar emails with the fake email signature of

"Felix Thompson, Book Publishing and Marketing Consultant" containing Amazon Mark 6.

Williams Decl., Ex. F. Scammers spoke to Bjorkdahl making repeated references to Amazon and

Amazon's business preferences and told him that their business was part of Amazon, when neither

"Amazon Prof Inc" or its billing entity TI have any connection to Amazon whatsoever. Bjorkdahl

Decl. ¶ 9; Crossman Decl. ¶ 8. An impostor claiming to be "Christine Collins, Senior Business

Analyst Amazon Digital Publishing" used the Amazon smile mark (Amazon Mark 3) in her email

signatures and on every page of the proposed publishing contract. Latimore Decl. Exs. C, D.

These five victims represent a fraction of the total number of victims impacted by the scam.

Defendants' misconduct also causes significant and ongoing financial damage to Amazon.

Amazon invests considerable resources to invest and bring enforcement actions against these

types of scams.[10] In 2023, Amazon "invested more than $1.2 billion and employed more than

15,000 people—including machine learning scientists, software developers, and expert

investigators—who were dedicated to protecting customers, brands, selling partners, and [its]

store from counterfeit, fraud, and other forms of abuse." Amazon.com, Inc., Brand Protection

Report (March 2024), available at amazon-brand-registry.com/amazon-brand-protection-report-

---

[10] Interview by Veronika Bondarenko with Amazon Executive, transcript available at *Amazon VP: Watch Out For These Common Holiday Scams*, THESTREET (Nov. 30, 2022), https://www.thestreet.com/retail/amazon-dharmesh-mehta-shopping-safety ("Amazon ... invest[s] significant resources to protect consumers and stores from these scammers."). The article notes that Amazon took down over 20,000 websites and 10,000 phone numbers used by impersonation schemes in 2021. *Id*. The Amazon Executive explains that Amazon spends vast resources detecting, uncovering, and combating bad actors, including a new partnership "with the Better Business Bureau to provide consumers with a searchable Scam Tracker that enables [consumers] to search suspicious communications reported by others by email, URL, phone number, and more." *Id*. Amazon is "diligently working to help educate consumers to avoid scams, ensure consumers know it's us, and ensure scammers are held accountable…Earlier this year, Amazon adopted industry-leading email verification technology across more than 20 countries to make it easier for customers to identify phishing emails and harder for scammers to commit fraud." *Id*.

MOTION FOR DEFAULT JUDGMENT                                    Case No. 4:23-cv-05580-TLT

324-en-bp?initialSessionID=133-8184895-7427546&ld=NSBing (last visited on September 11, 2024); *see also* Amazon.com, Inc., Annual Report (Form 10-K) (Feb. 2, 2024) (Amazon is "unable to prevent third parties from acquiring domain names that are similar to, infringe upon, or diminish the value of our trademarks and other proprietary rights…The protection of our intellectual property requires the expenditure of significant financial and managerial resources.").[11]

## III.    ARGUMENT

The Court may grant default judgment after the Clerk enters default under Rule 55(a). Fed. R. Civ. P. 55(b); *see also PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing *Kloepping v. Fireman's Fund*, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996)). The Clerk's entry of default establishes the defendant's liability, and the plaintiff's allegations are accepted as true. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). Before granting requests for default judgment, Ninth Circuit courts analyze seven factors from *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### A.    The Court Has Jurisdiction To Enter Default Judgment

At the outset, "a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). Here, the Court has subject matter jurisdiction over Amazon's claims and personal jurisdiction over Defendants.

#### 1.    Subject Matter Jurisdiction

The Court has subject matter jurisdiction over Amazon's Lanham Act claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 & 1338(a).

---

[11] The Court can take judicial notice of documents publicly filed with the SEC. *E.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (Ninth Circuit courts can take judicial notice of securities offerings and corporate disclosure documents); *see also Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject to judicial notice).

MOTION FOR DEFAULT JUDGMENT

## 2.    Personal Jurisdiction

### a.    Foreign Defendants

The foreign Defendants Qureshi, MU Khan, Agar, and Nizam's extensive contacts with the United States subject them to this Court's jurisdiction and allow them to be held accountable for the harm they caused victims in the United States (and California). Federal Rule of Civil Procedure 4(k)(2) serves as the federal long-arm statute for federal claims against foreign nationals. A court may exercise personal jurisdiction over a foreign defendant under Rule 4(k)(2) when: (1) the claim arises under federal law; (2) the defendant is not subject to general jurisdiction in any state; and (3) the exercise of personal jurisdiction is consistent with due process. *See* Fed. R. Civ. P. 4(k)(2); *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007) (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006)). The third element is satisfied when a defendant has "minimum contacts" with the United States. *See Holland*, 485 F.3d at 462; *Pebble Beach*, 453 F.3d at 1158-59 ("This ability to look to the aggregate contacts of a defendant with the United States as a whole instead of a particular state forum is a product of Rule 4(k)(2)."). Apart from the relevant forum, the due process analysis under Rule 4(k)(2) is "identical" to the due process analysis under California's long-arm statute. *See Pebble Beach*, 453 F.3d at 1159.

Here, all requirements are met. Amazon's claims against Defendants arise under the Lanham Act, *see* Compl. ¶¶ 57-121. The foreign Defendants are not subject to general jurisdiction in any state. *Id.* ¶¶ 21-23;[12] *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (noting that a court can assert general jurisdiction over a corporation [or an individual] only if it is "essentially at home" in the forum state). They have "minimum contacts" with the United States. Defendants affirmatively faked an affiliation with a major U.S.-based company to perpetrate widespread fraud on U.S.-based consumers, advertised U.S.-based addresses, operated U.S.-based phone numbers, and took payment using U.S.-based payment processors for their businesses.

---

[12] Amazon alleged in the Complaint that Defendant MU Khan was a resident of Virginia, but after attempting to serve MU Khan at a Virginia address and search public records in other states, came to believe that he currently resides in Pakistan. *Compare* Compl. ¶ 8 *with* Declaration of Emily Goodell, ECF No. 61-1 ¶¶ 5-24.

Case No. 4:23-cv-05580-TLT

MOTION FOR DEFAULT JUDGMENT

Compl. ¶¶ 57-121. Under these circumstances, the Court's exercise of jurisdiction over the foreign Defendants is reasonable. *See Pebble Beach*, 453 F.3d at 1155 ("minimum contacts" test is satisfied where: "(1) the defendant has performed some act or consummated some transaction within the forum,…(2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable").

### b.    California Defendants

A court has general personal jurisdiction over a defendant whose contacts with the forum are "continuous and systematic," even if those contacts are wholly unrelated to the plaintiff's claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). Defendant TI is a California corporation registered at an address in Los Angeles, California. Compl. ¶ 16. Defendant MZ Khan, the sole officer of TI is also domiciled in Los Angeles. *Id.* ¶ 15; ECF No. 61-1 ¶ 9. These Defendants thus have "continuous and systematic" contacts with California, subjecting them to general personal jurisdiction in this State. *See e.g.*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as home [including] place of incorporation").

### c.    Domestic Non-California Defendants

If the court lacks general personal jurisdiction, it may have specific (also known as "limited") personal jurisdiction if the defendant has certain minimum contacts with the forum state, the controversy arose out of those contacts, and the exercise of jurisdiction is reasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985).[13] The inquiry whether a forum state may assert specific jurisdiction over a nonresident defendant "focuses on the relationship

---

[13] Because Amazon shows that Defendants have minimum contacts with California, and that the controversy arises out of those contacts, the burden is on Defendants to show a "compelling case" that the exercise of jurisdiction would not be reasonable. *Burger King*, 471 U.S. at 476-78. Because they have defaulted, Defendants cannot make this showing. Nor could they if they tried. They are responsible for a wide-ranging scam operation making specific use of California physical addresses to facilitate their unlawful activities. Compl. ¶¶ 57, 60, 65, 68, 70, 72, 80, 88, 104 n.29, 108.

MOTION FOR DEFAULT JUDGMENT

among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (cleaned up). For claims sounding in tort, the non-resident must have "purposefully directed" activities at the forum state. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

The Ninth Circuit applies a three-part test for the purposeful direction analysis: a defendant "purposefully directed his activities at the forum if [the defendant]: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely be to be suffered in the forum state.'" *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (citation omitted). This test applies in trademark disputes. *See, e.g.*, *Nissan Motor Co. v. Nissan Comput. Corp.*, 246 F.3d 675, 675 (9th Cir. 2000) (applying purposeful direction analysis to trademark infringement lawsuit); *Adobe Sys. Inc. v. Accoladian Res. LLC*, 2014 WL 3737979, at *3 (N.D. Cal. July 28, 2014) (same).

The non-California domestic Defendants are a collection of individuals and entities based in various states, including Florida, Virginia, New York, Illinois, and Texas. Compl. ¶¶ 9-14, 17-20. Each of these Defendants committed intentional acts of trademark infringement and/or cybersquatting expressly directed to California, ***using specific physical addresses in California***. *Id.* ¶¶ 57, 60, 65, 68, 70, 72, 80, 88, 104 n.29, 108. "[A] corporation can suffer economic harm [] where the bad acts occurred." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1231 (9th Cir. 2011). Because the "economic loss caused by the intentional infringement of [Amazon's trademarks] is foreseeable, [i]t was foreseeable that this economic loss would be inflicted not only in [Washington, Amazon's] principal place of business, but also in California." *Id.* at 1232 (personal jurisdiction in California existed over Ohio corporation in copyright claim by Florida corporation). California is one of KPD and APub's largest sales territories in the U.S. Sommerfeld Decl. ¶ 9; Declaration of Courtney Sakre ("Sakre Decl.") ¶ 13. A significant number of APub customers and authors reside in California, as well as a significant number of KDP customers. *Id.* Because a "significant number of Californians" use Amazon's publishing services and are subject to being confused and defrauded by Defendants' conduct, "a jurisdictionally

significant amount of [Amazon's] economic harm took place in California." *See Mavrix Photo*, 647 F.3d at 1230.

**B.    Plaintiffs Are Entitled to a Default Judgment**

For default judgment requests, Ninth Circuit courts consider the seven *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471-72. All seven factors warrant granting default judgment here.

**1.    First *Eitel* Factor: Plaintiffs Will Be Prejudiced Without a Default Judgment**

The first factor weighs in favor of default judgment because Plaintiffs will be prejudiced without a default judgment. Without a default judgment, Plaintiffs have no legal remedy for Defendants' harm and no way to prevent Defendants from causing further damage. *See, e.g.*, *Nucal Foods, Inc. v. Kaye*, 2013 WL 1680643, at *3, *7 (E.D. Cal. April 17, 2013), *report & recommendation adopted*, 2013 WL 12312812 (E.D. Cal. June 25, 2013) ("defendant's conduct can be deemed willful and deceptive in light of his failure to defend this action").

**2.    Second and Third *Eitel* Factors: Amazon Has Established Defendants' Liability Under the Lanham Act**

As the second and third *Eitel* factors are often analyzed together, the Court must decide if Amazon has pleaded facts sufficient to establish and succeed upon the asserted claims. *See PepsiCo*, 238 F. Supp. 2d at 1175; *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499-500 (C.D. Cal. 2003).

**a.    Amazon Has Established Defendants' Liability for Trademark Infringement**

Plaintiffs' evidence and allegations establish the two elements of their trademark infringement claim: (1) a protected ownership interest in the mark; and (2) Defendants' use of Amazon's Marks "is likely to cause confusion, or to cause mistake, or to deceive." *Reno Air*

*Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) (citation internal quotation marks omitted); 15 U.S.C. § 1114.

**First**, Amazon has provided the registrations for each infringed trademark. Compl. ¶ 36; Freed Decl., Ex. A. This uncontested proof of registration establishes Amazon's protected ownership interest. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

**Second**, as alleged, Defendants' use of Amazon's Marks confused customers as to the origin of Defendants' fraudulent publication assistance services. Compl. ¶¶ 1, 3, 37, 61-63, 75-78, 99, 121, 126-28, 137, 144, 149; Folkerts Decl. ¶¶ 6, 8; Williams Decl. ¶¶ 12, 23, Ex. F; Bjorkdahl Decl. ¶¶ 6, 8, 11; Jaeger Decl. ¶¶ 9-11; Latimore Decl. ¶¶ 6-7, 11. Amazon's Marks have acquired immense goodwill, and have thus achieved tremendous trust and recognition. Compl. ¶¶ 3, 30-36. Defendants intentionally used both exact copies and confusingly similar knockoffs of Amazon's Marks on Defendants' Websites and other documents, which were designed to impersonate Amazon in order to deceive customers and trick them into paying for Defendants' fraudulent services. Compl. ¶¶ 60, 63, 65, 68, 70, 72, 74, 78, 80, 83, 86, 88, 90, 93, 96-98, 101, 104, 106, 108, 111-12, 114, 118, 120; Mello Decl. ¶¶ 7, 13; Folkerts Decl. ¶¶ 6, 8; Williams Decl. ¶¶ 12, 23, Ex. F; Bjorkdahl Decl. ¶¶ 6, 8, 11; Jaeger Decl. ¶¶ 9-11; Latimore Decl. ¶¶ 6-7, 11. Cases like this—where the infringer used exact copies of Amazon's Marks to target Amazon's customers—"present[] an easy analysis in terms of likelihood of confusion." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076-78 (9th Cir. 2006). Amazon has thus shown a protected ownership interest and demonstrated how Defendants caused customer confusion.

### b. Amazon Has Established Defendants' Liability for False Designation of Origin and False Advertising

A claim for false designation of origin and false advertising arises where the misuse of a trademark confuses or deceives consumers, or where the infringement misrepresents the nature and qualities of the products sold. 15 U.S.C. § 1125. Thus, to prevail under this provision, Amazon must show that Defendants: "(1) used in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or

services in question." *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1170 (N.D. Cal. 2015) (citing *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007)). Although there are some differences between a claim under § 1114 (trademark infringement) and § 1125(a) (false designation of origin), "the analysis under the two provisions is oftentimes identical." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999).

Courts routinely find these elements met where the plaintiff establishes that defendants have used a trademark in connection with the sale of fraudulent, counterfeit, or otherwise unauthorized merchandise on the internet. For example, in *Spy Optic, Inc. v. Alibaba.com, Inc.*, the court considered an allegation against a company that improperly used a registered mark in the design of a website. 163 F. Supp. 3d 755, 765-66 (C.D. Cal. 2015). The court found that "by directing consumers to allegedly-infringing sellers, Defendant creates a likelihood that consumers would be confused as to the origin of the allegedly-infringing products—instead of buying authentic Spy products, consumers would unknowingly purchase counterfeit merchandise." *Id*. at 765.

Here, Defendants' Websites and their communications with individual victims affirmatively and falsely conveyed an affiliation with Amazon, causing their victims to buy inferior, inauthentic, overpriced, and often non-existent publication assistance services. Compl. ¶¶ 3, 37, 59-121; *see generally* Folkerts Decl.; Bjorkdahl Decl.; Williams Decl.; Jaeger Decl.; and Latimore Decl. In reality, Amazon offers legitimate publication assistance services to its customers—including some of the services peddled by Defendants—either for a fee or for some services, free of charge. Compl. ¶¶ 31, 33-34. Defendants' false and deceptive conduct jeopardized the trust that customers place in the Amazon brand, and misled consumers as to the origin, authenticity, and quality of the services Defendants offered to the public. *Id*. ¶¶ 2-3, 30-37, 136-37.

### c.    Amazon Has Established Defendants' Liability for Cybersquatting

Amazon's evidence and allegations establish its cybersquatting claim by showing that: "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant

MOTION FOR DEFAULT JUDGMENT

acted with bad faith intent to profit from that mark." *Digby Adler Grp. LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1102 (N.D. Cal. 2015) (cleaned up). When evaluating cybersquatting claims, the "court should not look beyond the domain name to consider the content of the website," and the court's inquiry is "narrower than the traditional multifactor likelihood of confusion test for trademark infringement." *Nucal Foods*, 2013 WL 1680643, at *4 (cleaned up).

Under the first factor, Amazon has shown that Defendants registered and/or used twenty-one domains as part of their scheme.[14] Compl. ¶¶ 57, 59, 64, 67, 69, 71, 73, 79, 85, 87, 89, 92, 95, 100, 103, 105, 107, 109, 113, 116, 119; *see also* MacNaughton Decl. ¶¶ 7-8 & Exs. B-C (subpoena responses identifying Defendants Agar and Nizam as registrants for Websites 19 and 23, and Defendant TD as registrant for Websites 10 and 25).

Under the second factor, Defendants' domains used Amazon's Marks in a confusing manner that created the impression that Defendants' 21 Websites were affiliated with Amazon, and that the services advertised on those Websites were affiliated with Amazon. The names of the Websites were designed to, and did in fact, in many instances, confuse reasonable customers about whether the Websites belonged to Amazon. Comp. ¶¶ 59-121; Folkerts Decl. ¶¶ 6, 8; Williams Decl. ¶¶ 12, 23, Ex. F; Bjorkdahl Decl. ¶¶ 6, 8, 11; Jaeger Decl. ¶¶ 9-11; Latimore Decl. ¶¶ 5-7.

As to the third factor, Defendants have not denied or refuted Amazon's allegation that "Defendants registered and used the domains of the Subject Websites with a bad faith intent to profit from the Amazon Marks" by "using the Marks to divert consumers from Plaintiff's online location, to sites operated by Defendants for commercial gain, and creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site" and by "registering or acquiring multiple similar domain names using Amazon Marks, which are confusingly similar

---

[14] amazondigitalpublishing.com; amazonkindledirectpublishing.com; amazondigitalpublisher.com; amazondigitalpublishers.com; amazonpublishingsol.com; amazonproinc.com; amazonprofinc.com; amazonkindlebookpublishing.com; amazonkindleproinc.com; amazonkdpublishers.com; amazonpublishers.ca; amazonbookhub.com.au; amazondigitalpro.com; amzdigitalpro.com; amazonpublisherpro.com; amazonpublishingzone.com; amazonkdpublishing.com; amazonkdppublication.com; amazonpublishingpartner.com; amazonprofessionalpublishers.com; and amzkindlepublishing.com.

Case No. 4:23-cv-05580-TLT

MOTION FOR DEFAULT JUDGMENT

1  or dilutive of domain names used by Plaintiffs, used to advertise similar services." Compl. ¶¶ 149-

2  50; *see also Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1080 (C.D. Cal. 2012)

3  (granting default judgment award for cyberpiracy claim based on finding that plaintiff's complaint

4  adequately alleged claim's necessary elements). Thus, it is appropriate and warranted for the

5  Court to find that Defendants' domains illegally used Amazon's Marks to capitalize on the

6  goodwill and recognizability of Amazon's brands and products.

7        **3.**    **Fourth *Eitel* Factor: Defendants' Conduct Warrants the Damages Amazon Seeks**

8

9        The Lanham Act authorizes statutory damages of up to $2 million per mark for willful

10  trademark infringement and up to $100,000 per instance of cybersquatting. 15 U.S.C. §

11  1117(c)(2) and (d). As explained below, Amazon requests $500,000 against each Defendant for

12  each unique Amazon Mark that was willfully infringed upon as statutory trademark infringement

13  damages; and an additional $100,000 each for any of the domain names of the 21 Websites for

14  which that Defendant was the registrant as statutory damages for cybersquatting. Amazon makes

15  the request for $500,000 per willfully infringed Mark—which is only a fraction of the maximum

16  statutory damages allowed—despite the fact that the Marks were used on multiple Websites or

17  documents associated with each Defendant, with the exception of Defendant Qureshi.

18  Furthermore, Amazon seeks damages against each Defendant only where it has alleged or proven

19  a connection between the Defendant and a particular Website, rather than seeking to hold all 16

20  defaulting Defendants jointly and severally liable for a conspiracy spanning the 21 Websites, as

21  alleged in the Complaint.

22        When, as here, there is limited evidence of a defendant's illicit revenue because a

23  defendant failed to respond, statutory damages are proper because "a civil litigant may not be able

24  to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed

25  information about his counterfeiting." S. REP. NO. 104-177, at 10 (1995) ("Enabling trademark

26  owners to elect statutory damages is both necessary and appropriate in light of the deception

27  routinely practiced by counterfeiters. The [statutory damage] *amounts are appropriate given the*

28  *extent of damage done to business goodwill by infringement of trademarks*.") (emphasis added).

1    Requests for statutory damages must be proportionate to the value of Amazon's
2    trademarks, account for the persistent nature of a defendant's unlawful conduct, and account for a
3    "defendant's failure to cooperate with plaintiff in its efforts to litigate [the] matter." *Microsoft*
4    *Corp. v. Nop*, 549 F. Supp. 2d 1233, 1238 (E.D. Cal. 2008) (granting $700,000 default judgment
5    award in statutory damages for non-willful infringement of seven trademarks and noting that the
6    award was "reasonable in light of the amount of damages awarded in similar cases"). Courts may
7    grant substantial statutory damages awards under the Lanham Act when the amount of money
8    awarded "will likely serve to deter [the] defendant and others" from engaging in similar unlawful
9    conduct. *Id*. Here, Amazon's request for statutory damages of $500,000 per Amazon Mark and
10    $100,000 for each cybersquatting violation is appropriate for three reasons.

11    ***First***, this amount of damages is reasonably calculated to deter conduct like Defendants'
12    fraud scheme. The goal of awarding damages in cases like this one is to "take all the economic
13    incentive out of trademark infringement" because relief that fails to eliminate financial
14    motivations "would encourage a counterfeiter to merely switch from one infringing scheme to
15    another as soon as the infringed owner became aware of the fabrication." *Playboy Enters., Inc. v.*
16    *Baccarat Clothing Co.*, 692 F.2d 1272, 1274-75 (9th Cir. 1982) (nominal damages "fail to serve
17    as a convincing deterrent to the profit maximizing entrepreneur who engages in trademark
18    piracy."); *see also Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986)
19    (district court's award was too small to remove defendant's economic incentive); *Intel Corp. v.*
20    *Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (affirming district court's award that deterred
21    defendants from "selling [counterfeit products] to their unknowing customers").

22    Where evidence shows "the use of the confusing mark was wilful and repeated, even in
23    the absence of evidence of the extent of Plaintiff's loss or the Defendant's profits, it is appropriate
24    to award damages for the purpose of deterrence." *Microsoft Corp. v. Evans*, 2007 WL 3034661, at
25    *8 (E.D. Cal. Oct. 17, 2007), *report & recommendation adopted,* 2007 WL 4209368 (E.D. Cal.
26    Nov. 28, 2007); *see also Philip Morris*, 219 F.R.D. at 501 ("The Supreme Court has held that
27    deterrence of future infringement is an important factor in determining damages[.]"). If a
28    defendant has not appeared and their infringement is willful, "a ***significant interest in deterrence***

*is presented…the circumstances necessarily demonstrate an interest in the protection of the public*." *Evans*, 2007 WL 3034661, at \*8 (emphasis added). In cases like this one, "the consuming public is equally injured by an inadequate judicial response to trademark infringement." *Playboy Enters.*, 692 F.2d at 1275. Here, a large judgment is warranted to protect the public from future deception and victimization by Defendants and others who seek to profit from Amazon's goodwill and customer trust.[15]

*Second*, the Court should not allow Defendants to evade responsibility for their unlawful conduct by electing not to appear. A nominal award would effectively reward Defendants by presuming their absence means their scheme was limited. But Amazon has provided evidence substantiating Defendants' ongoing willful infringement, and Plaintiffs have "the right to pursue statutory damages without proving actual damages." *Nop*, 549 F. Supp. 2d at 1237.

*Third*, due to the depth of the consumer-confusion evidence and the high-dollar injuries incurred by Defendants' victims, Amazon seeks a higher award than it received in other recent cases before California federal courts. In *Amazon.com, Inc. v. Pionera Inc.*, Amazon sought $500,000 for willful trademark infringement of two of Amazon's "RING" trademarks and $100,000 in cybersquatting damages for defendants' use of the domain name reingsuport.com. 2023 WL 4424649, at \*8 (E.D. Cal. July 10, 2023), *report & recommendation adopted*, 2023 WL 6282758 (E.D. Cal. Sept. 26, 2023). The district court awarded $200,000 in trademark infringement damages for each mark based on a finding that Amazon had not put forth sufficient evidence of significant confusion in the marketplace aside from affidavits from investigators, or any concrete evidence of damages beyond intangible harm to Amazon's goodwill. The court reduced Amazon's requested $100,000 in cybersquatting damages to $25,000 because although Amazon had shown the willfulness of the defendant's cybersquatting, it did not establish the other

---

[15] *See*, *e.g.*, *Amazon.com, Inc. v. Oron*, No. 2:19-cv-00523-RSM (W.D. Wash. 2022), ECF No. 120 ($7 million default judgment award against defendants who unlawfully used Amazon trademarks to offer fake work-at-home jobs that lured consumers to defendants' websites); *Amazon.com, Inc. v. Huang Tengwei*, 2019 WL 4414957, at \*1 (W.D. Wash. Sept. 16, 2019) (awarding statutory damages of $2 million for infringement of "AMAZON" trademark and trademarked Amazon logo where defendants tricked consumers using a website "replete with Amazon's trademarks and other indications of Amazon's brand [and] intentionally designed … to deceive victims into believing it was affiliated with Amazon").

factors for setting cybersquatting damages, including "the defendant's use of false contact information to conceal its infringing activities," the defendant's status as a "serial cybersquatter ... and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings." *Id.* at *8 (citing *Digby Adler Grp. LLC, 79* F. Supp. 3d at 1108. And in *Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd.*,—another case where the individual consumer injuries were small and there was less evidence of injury to Amazon—the court entered a default judgment award of $200,000 per registered trademark and $25,000 per infringing domain name. 2021 WL 4461601, at *11 (N.D. Cal. Sept. 22, 2021), *report & recommendation adopted,* 2021 WL 4896120 (N.D. Cal. Oct. 20, 2021) (awarding $200,000 per infringed Amazon ALEXA trademark where Amazon provided Alexa services for free and therefore failed to demonstrate that defrauded customers would have otherwise generated sales for Amazon).

This case is substantially more egregious than *Pionera* or *Expert Tech Rogers*—where there was less evidence of confusion or injury, and individual consumer injuries were small— warranting a materially higher damages award. Unlike in those cases, Amazon has provided evidence from five victims—Williams, Bjorkdahl, Jaeger, Folkers, and Latimore—alleging that they collectively paid more than $61,000 to Defendants.[16] Because these victims were attempting to do business with Amazon when they were ensnared by Defendants using Amazon's Marks, Amazon thus presents tangible proof that its publishing businesses APub and KDP are losing business from potential author customers as a result Defendants' conduct in addition to the much greater, general injury to Amazon's reputation and goodwill. Furthermore, five of the Defendants registered multiple domain names with terms like AMAZON, KINDLE, and DIRECT PUBLISHER to trick visitors to the various Websites hosted on those domains into believing they were part of Amazon, and all but one defaulting Defendant are linked to multiple Websites.

---

[16] This amount does not include chargebacks paid by credit card providers or refunds issued to the Defendants. Folkerts paid $7,023, and was only able to recover $500 through her credit card provider (Folkerts Decl. ¶¶18-19); Jaeger paid $9,000 and recovered $9,000 through his credit card provider (Jaeger Decl. ¶ 21); Bjorkdahl paid $2,250 and could not recover any money (Bjorkdahl Decl. ¶¶ 12,17); Williams paid $35,165 and was able to recover only $27,165 in refunds (Williams Decl. ¶¶ 22, 32-33); and Latimore was able to recover her full payment of $1,599 (Latimore Decl. ¶¶ 12, 18).

MOTION FOR DEFAULT JUDGMENT

Amazon seeks only a single award per infringed mark directly attributable to each Defendant regardless of the number of websites where the Defendant used the mark.

### 4.    Fifth *Eitel* Factor: The Facts Are Undisputed

The fifth factor favors a default judgment because default has been entered. ECF Nos. 52, 62. Amazon has submitted well-pleaded allegations describing its statutory claims with supporting Declarations. "Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists." *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005); *accord Philip Morris*, 219 F.R.D. at 500; *PepsiCo*, 238 F. Supp. 2d at 1177; *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1212 (W.D. Wash. 2014), *aff'd*, 682 F. App'x 604 (9th Cir. 2017) ("When default has been entered, courts find that there is no longer the possibility of a dispute concerning material facts[.]"). Defendants' failure to appear, file an answer, or refute Amazon's allegations shows that there is no dispute over material facts.

### 5.    Sixth *Eitel* Factor: Defendants' Failure To Appear Is Inexcusable

Under the sixth *Eitel* factor, the Court must consider whether Defendants' default resulted from excusable neglect. *Eitel*, 782 F.2d at 1471-72. No facts suggest that Defendants' failure to respond here stems from excusable neglect. *See Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001) (defendant's default when properly served with complaint and notice of entry of default not attributable to excusable neglect). Defendants' conduct is not excusable because Defendants were served with process but did not file a responsive pleading or otherwise make an appearance here. *See Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987) ("A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and failed to answer.") (citation omitted); *see* ECF Nos. 18, 22-23, 25-29, 31, 33, 34, 59 (proofs of service).

Notably, several of the defaulted Defendants reached out to Amazon's lawyers during the pendency of this case but never followed up on communications or attempted to appear or defend themselves. *See generally* Goodell Decl. ¶¶ 2-3, 7-17. The sixth factor also supports entering a default judgment against Defendants.

### 6. Seventh *Eitel* Factor: Policy Favoring Decisions on the Merits Does Not Preclude Default Judgment as Defendants Failed To Appear

The final *Eitel* factor considers the preference for deciding cases on the merits. *Eitel*, 782 F.2d at 1471-72. In cases like this one, where Defendants failed to appear, "district courts have regularly held that this policy, standing alone, is not dispositive[.]" *HICA Educ. Loan Corp. v. Warne*, 2012 WL 1156402, at *3 (N.D. Cal. Apr. 6, 2012); *see also U.S. Wholesale Outlet & Distrib., Inc. v. US Wholesale*, 2021 WL 2562596, at *6 (E.D. Cal. 2021), *report & recommendation adopted,* 2021 WL 4443186 (E.D. Cal. Sept. 28, 2021) (policy favoring decisions on the merits "does not, by itself, preclude the entry of default judgment"). Defendants knowingly abandoned *any* defense of this action. Thus, Defendants' own actions prevented a decision on the merits. As a result, this factor also supports entering a default judgment.

## C. Amazon Is Entitled To Statutory Damages

Amazon seeks $500,000 in statutory damages each for Defendants' willful infringement of 5 Marks: Marks 1-3, 6, and 8. Amazon also seeks $100,000 in statutory damages against the seven Defendant registrants of 19 of the 21 domains included in Amazon's cybersquatting claim.

Considering Defendants' use of Amazon's Marks to commit fraud and the high-dollar impact the fraud scheme had on customers seeking legitimate services, an award of 25% of the maximum statutory damages per mark is warranted to hold Defendants accountable and deter future exploitation of the Amazon Marks by Defendants and others. *See* 15 U.S.C. § 1117(c)(2) (authorizing $2 million in statutory damages per mark for willful infringement). Amazon also seeks $100,000 in statutory damages for Defendants' use of the infringing domains in violation of 15 U.S.C. § 1125(d). Under 15 U.S.C. § 1117(d), Amazon can be awarded between $1,000 and $100,000 per domain name, as the court considers just. *See Digby Adler*, 79 F. Supp. 3d at 1108. Like the claim for trademark infringement, this award is necessary to hold Defendants accountable and deter the future exploitation of Amazon's trademarks by Defendants and others.

### 1. Defendants Willfully Infringed Plaintiffs' Trademarks

Willful trademark infringement occurs when the defendant's conduct is "willfully calculated to exploit the advantage of an established mark," *DC Comics v. Towle*, 802 F.3d 1012,

1026 (9th Cir. 2015), such as when the defendant's conduct is "deliberate, false, misleading, or fraudulent." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015) (internal quotation marks omitted). In default judgment cases, allegations of willful conduct are admitted based on the defendant's failure to defend. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008).

Amazon's allegations of willfulness are admitted, and they are also supported by strong evidence. Defendants willfully used counterfeit versions of the Amazon Marks on their Websites and in documents sent to customers to impersonate Amazon and deceive victims into buying phony, inferior, unnecessary, and non-existent publishing support services. Compl. ¶¶ 57-121. The primary purpose of the Websites was to deceive consumers into believing Defendants were affiliated with Amazon. *Id.* Several domains registered by Defendants were transferred to Amazon as a result of a series of UDRP actions filed by Amazon. Compl. ¶¶ 58 n. 11, 151. Despite this, Defendants continued to perpetrate the scheme, sometimes after pivoting to new domains.[17]

Multiple victims and an investigator reported that Defendants changed email domains throughout their interactions, but consistently used domains that suggested a connection to Amazon. Compl. ¶¶ 62, 63, 64, 77, Folkerts Decl., Exs. C, E, Q, R; Jaeger Decl. ¶¶ 7, 24, 28, Mello Decl. ¶ ¶ 6, 16; Latimore Decl. Ex. D.

---

[17] FA2305002043019 decision filed on 6/16/2023 granted the transfer of domains registered by Defendants Agar, Nizam, and Alam. After that date, Defendant Agar was listed as the registrant of Website 15 (Compl. ¶ 87). Defendants Nizam and Alam are alleged to have operated Facebook and LinkedIn pages using Amazon Marks that were active on 8/2/23, ( ¶¶ 97 n. 26, 98 n. 27) and Websites 19 and 23, which were also active in August 2023 (¶¶ 101 n. 28, 109, 111 n. 32). FA2303002034427 decision filed on 4/13/2023 granted the transfer of domains registered by Defendant Anwar. After that date, but prior to the domain being transferred, an investigator visited Website 24, and engaged with an individual contacted through the site that represented that they were affiliated with Amazon (Mello Decl. ¶ 6, 16). FA2212002023877 decision filed on 1/5/23 granted the transfer of domains registered by Defendant Rawoof. After that time, his entity SSS was used to register the domains for Websites 13 and 15 (Compl. ¶¶ 82, 87).

MOTION FOR DEFAULT JUDGMENT                                    Case No. 4:23-cv-05580-TLT

**2.      $500,000 Per Mark and $100,000 Per Domain in Statutory Damages Is a Reasonable Award in Relation to Defendants' Conduct and the Need for Deterrence**

"Statutory damages further 'compensatory and punitive purposes,' and help 'sanction and vindicate the statutory policy of discouraging infringement.'" *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009) (quoting *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir.1998)). "[A] plaintiff may recover statutory damages 'whether or not there is adequate evidence of the actual damages suffered by the plaintiff or of the profits reaped by defendant.'" *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990) (quoting *Harris v. Emus Recs. Corp.,* 734 F.2d 1329, 1335 (9th Cir. 1984)). Here, statutory damages are particularly appropriate "because the information needed to prove actual damages is within the infringers' control and is not disclosed." *Nop*, 549 F. Supp. 2d at 1238 (quoting *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 882 (S.D. Ohio 2007)).

In cases of willful infringement, courts consider the need: (1) to compensate the plaintiff for the damage the defendant's actions caused; (2) to deter defendants from violating the trademarks; and (3) to punish defendants for willfully violating the trademarks. *See Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1124 (C.D. Cal. 2007). "The flagrant nature of defendants' activities underscores the need for a damages award that will deter them from engaging in such conduct in the future." *Nautilus, Inc. v. Chunchai Yu*, 2011 WL 13213575, at *16 (C.D. Cal. Dec. 19, 2011) (awarding $8 million in statutory damages for willful infringement of four trademarks); *see also Wimo Labs, LLC v. eBay, Inc.*, 2017 WL 10439835, at *6 (C.D. Cal. Aug. 3, 2017) (awarding maximum $4 million in statutory damages where defendants infringed two trademarks).

Defendants' willful conduct warrants the statutory damages Amazon seeks. Defendants' Websites directly presented victims with copies of the Amazon Marks, and used Amazon's Marks in the Websites' domain names, all in an effort to induce them to buy grossly inferior, unnecessary, and often non-existent services. The Websites had no purpose other than to leverage the Amazon Marks to defraud unsuspecting consumers, causing some consumers to lose thousands—even ***tens of thousands***—of dollars for fake or grossly inadequate publishing

services. Folkerts Decl. ¶ 19; Bjorkdahl Decl. ¶ 12; Jaeger Decl. ¶¶ 10, 15, 17; Wiliams Decl. ¶¶ 22, 33; Latimore Decl. ¶¶ 12-14.  Defendants fully understood the illegality of their scheme.

Based on the scope of Defendants' abuse of the Amazon Marks, a statutory damages award of $500,000 per mark and $100,000 per domain serves to compensate Amazon (at least in part) for the harm caused by Defendants. At a minimum, an untold number of victims paid for substandard services from Defendants under false pretenses and were fleeced out of substantial sums of money. Defendants' refusal to participate in this litigation prevents Amazon from understanding the full scope of Defendants' scheme, including the significant impact it had on victims across the United States. Statutory damages provide a way to value otherwise unquantifiable damage to Amazon's reputation as one of the most highly regarded and trusted brands in the world.

The statutory damages Amazon seeks also serve to deter and punish Defendants. Without a substantial damages award, Defendants will have no incentive to stop abusing Amazon's brand, since they profit from doing so. While injunctive relief is both appropriate and necessary (as described below), it is not adequate alone to deter Defendants from continuing to perpetrate their illegal schemes.

**D.     Amazon Is Entitled to Injunctive Relief**

Amazon seeks to permanently enjoin Defendants from further infringing Amazon's Marks. The Lanham Act authorizes injunctive relief "to prevent the violation of any right of the registrant of a mark[.]" 15 U.S.C. § 1116(a). "As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 520 (9th Cir. 1993). Amazon has met the four requirements needed for a permanent injunction: (1) irreparable injury; (2) inadequate remedies available at law; (3) balancing hardships warrants injunction; and (4) injunction serves public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

MOTION FOR DEFAULT JUDGMENT

### 1. Defendants' Fraud Scheme Causes Irreparable Harm to Plaintiffs that Is Ongoing

"Harm to business goodwill and reputation is unquantifiable and considered irreparable." *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) (citing *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). A plaintiff seeking injunctive relief "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of … [a] likelihood of success on the merits[.]" 15 U.S.C. § 1116(a); *see, e.g.*, *Kinsley Tech. Co. v. Ya Creations, Inc.*, 2021 WL 2227394, at *4 (C.D. Cal. May 3, 2021) (irreparable harm presumed on showing of a likelihood of success on the merits); *see also Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 n.16 (N.D. Cal. 2021) (Lanham Act "reinforces the appropriateness of a permanent injunction").

Amazon has spent years building its reputation as a publisher for independent authors. Compl. ¶¶ 2, 30-36. Defendants perpetrated a widespread fraud that falsely advertised publishing services using Amazon's Marks for Defendants' own profit. *See id.* ¶¶ 59-121. Defendants' actions eroded customer trust in Amazon's brands and undermined Amazon's substantial investments in its brands. *Id.* When customers are deceived by schemes like the Defendants', they will inevitably be deterred from continuing to use and purchase Amazon products and services because of their negative experiences. The financial impact of losing customer trust— trust which permeates the very heart of Plaintiff's relationships with their customers—cannot be calculated with precision.

Amazon has therefore suffered unquantifiable and irreparable harm.

### 2. Monetary Damages Alone Are Inadequate

Defendants have shown that they are indifferent to any attempt by Amazon to enforce its rights. Defendants' failure to appear further suggests that their "infringing activities will not cease absent judicial intervention." *Warner Bros. Home Ent. Inc. v. Jimenez*, 2013 WL 3397672, at *7 (C.D. Cal. July 8, 2013); *see also Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) ("[D]efendant's lack of participation in this litigation has given the court no assurance that defendant's infringing activity will cease."). Injunctive relief is necessary to prevent Defendants

1  from continuing their fraudulent impersonation schemes and abuse of Amazon's Marks. *See also*

2  *Coach Servs., Inc. v. YNM, Inc.*, 2011 WL 1752091, at *4 (C.D. Cal. May 6, 2011) (permanent

3  injunction is appropriate in trademark cases unless it is "absolutely clear" that "defendant's

4  infringing activities have ceased and will not begin again").

5          **3.**     **The Balance of Equities Favors a Permanent Injunction**

6        "Defendants face no hardship in being enjoined from conducting illegal activities[.]"

7  *Rolex Watch U.S.A., Inc. v. Watch Empire LLC*, 2015 WL 9690322, at *8 (C.D. Cal. Sept. 29,

8  2015). Without an injunction, Amazon will continue to suffer irreparable harm from Defendants'

9  fraudulent conduct. The equities weigh heavily in favor of injunctive relief. *See, e.g.*, *Wecosign*,

10  845 F. Supp. 2d at 1084 ("[W]ithout an injunction, Plaintiff will lose profits and goodwill, while

11  an injunction will only proscribe Defendants' infringing activities.").

12          **4.**     **A Permanent Injunction Will Protect the Public from the Ongoing Harm**
                    **Caused by Defendants' Impersonation Scheme**

13

14        The public has a strong interest in not being confused or deceived by fraudulent and

15  infringing impersonation schemes. *See Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.,*

16  *Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009); *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d

17  1051, 1081 (E.D. Cal. 2009) ("When a trademark is said to have been infringed, what is actually

18  infringed is the right of the public to be free of confusion and the synonymous right of the

19  trademark owner to control his … reputation.") (citation omitted). Defendants have not only

20  caused customer confusion by impersonating Plaintiffs, but they have deceived customers needing

21  actual publication support services and collected money for useless services. Compl. ¶¶ 59-121;

22  *see generall*y Folkerts Decl.; Bjorkdahl Decl.; Williams Decl.; Jaeger Decl.; . Enjoining

23  Defendants from continuing to perpetrate harmful impersonation schemes is plainly in the public

24  interest.

25  **E.**     **Amazon Seeks Court Order for Transfer of Infringing Domains**

26        Amazon seeks an order for the transfer of the domain names used for Websites 6, 8, 9, 10,

27  19, 22, 23, and 25. These Websites are essential components of Defendants' infringing activities.

28  Since the Defendants have failed to appear, in order to effectuate an injunction as a practical

matter, the Websites' domain names should be ordered transferred by the domain Registrars and/or Registries to Amazon's control. Absent the transfer of the domain names, Defendants will remain free to continue infringing Amazon's trademarks with impunity, will continue to benefit from internet traffic to those domain names, and may continue to defraud the public.

The Court's powers of equity are sufficiently broad to compel measures necessary to enforce an injunction against infringement. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for. . . '[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.'"); *United States v. Bausch & Lomb Optical  Co.*, 321 U.S. 707, 724 (1944) ("Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole."). District courts are expressly authorized to order the transfer or surrender of domain names in an *in rem* action against a domain name. See 15 U.S.C. §§ 1125(d)(1)(C), (d)(2). However, the remedy is by no means limited to that context. *See, e.g., Philip Morris USA v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 230-31 & n.2 (S.D.N.Y. 2004) (Yesmoke.com domain name transferred to plaintiff despite the fact that plaintiff did not own a trademark in the term "Yesmoke" and noting that 15 U.S.C. § 1125 "neither states nor implies that an in rem action against the domain name constitutes the exclusive remedy for a plaintiff aggrieved by trademark violations in cyberspace."); *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 853 (E.D. Mich. 2006) (defendants ordered to disclose all other domain registrations held by them and to transfer registration of a particular domain name to plaintiff in part under authority of 15 U.S.C. § 1116(a)).

## IV.    CONCLUSION

Based on the foregoing factual record and arguments, Amazon respectfully requests that the Court award a default judgment against Defendants in the amount of $500,000 per Mark used by each Defendant and $100,000 per infringing domain registered by each Defendant, and enter the requested permanent injunctive relief.

MOTION FOR DEFAULT JUDGMENT

DATED: September 13, 2024                Respectfully submitted,

                                         DAVIS WRIGHT TREMAINE LLP


                                         By: */s/Emily Goodell*
                                             Bonnie MacNaughton
                                             John D. Freed
                                             Emily Goodell
                                             Jean M. Fundakowski

                                             Attorneys for Plaintiffs
                                             AMAZON.COM, INC.
                                             AMAZON TECHNOLOGIES, INC.

MOTION FOR DEFAULT JUDGMENT